[Civ. No. 6404. First Appellate District, Division Two.—October 10, 1928.]

AMERICAN SEEDLESS RAISIN CO. (a Corporation), Appellant, v. JOSHUA HENDY IRON WORKS (a Corporation), Respondent.

Hartley F. Peart, Charles V. Barfield and Sylvester J. McAtee for Appellant.

Byrne & Lamson for Respondent.

BUCK (G. F.), P. J., *pro tem.*—This is an action to recover damages for breach of warranty arising out of the sale of a farm tractor. Defendant recovered judgment by nonsuit and the plaintiff appealed.

The tractor in question was manufactured by the defendant on the order of its inventor, Mr. Martin, but at the time of this sale to plaintiff was owned by defendant, and defendant corporation in consummating the sale availed itself of the services of the inventor in making such a successful demonstration of the merits of the tractor that the plaintiff purchased it and paid to the defendant the purchase price in the sum of $4,738.60. Though there were the not unusual representations touching the quality of workmanship and construction, the following constituted the only writing given by the defendant covering express warranties:

"The undersigned warrants to the above purchaser full and legal title to the above described tractor, and hereby guarantees same against any litigation with reference to patents, or royalties or adverse claims of any kind or nature, and further agrees to replace free of charge, f.o.b. Sunnyvale, Cal., within one year from date hereof, any part or parts which may require replacement by reason of defective workmanship or material other than for electrical parts.

"Joshua Hendy Iron Works,
"By A. J. Behneman, Manager."

For comparison it may be noted that this in some of its features is not dissimilar to the written guarantee construed in the case of *Moss* v. *Smith*, 181 Cal. 519 [185 Pac. 385], which contains the following language: "To be free from defects in materials or workmanship for one year from the 13th day of October, 1914, *and will replace such defective part or parts in the car absolutely free of charge when delivered at our place of business.*" (Italics ours.)

But as regards material and workmanship it is evident in the case at bar that the written warranty contains no direct statements that can be construed as an express warranty. In fact the warranty in the case at bar absolutely omits any statement of any existing fact, or assurance of any existing fact, on the subject of material or workmanship. Consequently the court cannot under the guise of construction incorporate in the contract something which the parties to the contract expressly omitted to incorporate. But the law, as laid down in our codes, does and will in certain circumstances incorporate where the parties have failed expressly so to do in an agreement for sale, certain implied warranties, one of which is the following: "One who sells or agrees to sell an article of his own manufacture thereby warrants it to be free from any latent defects not disclosed to the buyer arising from the process of manufacture." (Sec. 1769, Civ. Code.)

█ And, as above shown, it is the established rule in this state that these warranties implied by law may be deemed incorporated in the contract. (*Remsberg* v. *Hackney Mfg. Co.*, 174 Cal. 799, 805 [164 Pac. 792]; *Bancroft* v. *San Francisco Tool Co.*, 5 Cal. Unrep. 587 [47 Pac. 684]; *Hoult* v. *Baldwin*, 67 Cal. 610, 613 [8 Pac. 440]; *Snyder* v. *Holt Mfg. Co.*, 134 Cal. 324, 328 [66 Pac. 311], 2 Mechem on Sales, sec. 1258, p. 1094; 2 Williston on Contracts, 1872, par. 993.)

In this connection, however, it is respondent's contention in support of the judgment of nonsuit that "Section 1769 of the Civil Code has no application for the reason that there was no evidence that there was any latent defect arising from the process of manufacture." And also that it is too late to invoke this section on appeal "as counsel for appellant announced at the beginning of the trial that they were relying only on the so-called written warranty, and on the implied warranty found in section 1770 of the Civil Code."

█ And first as to whether "there is any such substantial evidence which, with the aid of all legitimate inferences available to plaintiff" would support a finding that there was a latent defect in the tractor arising from the process of manufacture.

The testimony on behalf of the plaintiff shows from the time the tractor was paid for, on or about March 10, 1921, up to the time it was finally abandoned in April, 1922, that numerous defects and weaknesses were observed in the different parts of the machinery, noticeably in the gearing, shafting, bearings, differentials, and transmission, some of which, however, were replaced. As stated by one of the witnesses, "we had more or less gear shift trouble, right along, but not so bad, it gradually got worse. The gear shift trouble started about the 8th or 10th of March. . . . I notified Mr. Martin respecting that . . . with respect to the gears he attempted to fix them—to install them to act properly; he tried to repair them but they did not act properly after that. He changed some of the levers, he changed the levers somewhat, the parts. . . . After we had opened up the machine, when the levers would not change gears we found that the shaft on which the level gears were, were worn. They were worn enough that you couldn't change gears. . . . The teeth of the gears were worn, I should say they were worn one-eighth of an inch. . . . These gears were eventually replaced by new one. I discovered the bevel gear was worn when we opened the case. . . . We found the teeth in the gears were worn."

In April respondent wrote to appellant as follows: "It will be a day or two before I can straighten out that situation, as I want to go into the matter and ascertain the reason for the trouble. If I find it is necessary to make the shafts harder I will have to have same treated before I can send them to you."

And again on April 21st: "We are hardening and heat treating two shafts to go in the transmission and these should be finished by tomorrow night, at which time we will send a man to Livingston to install them. We regret the delay in this matter but the writer feels as if it is better to have ascertained just what the difficulty was and rectify it permanently, than to stab at it in the way of temporary matter."

On May 16, 1921, respondent wrote as follows: "We have completed the layout for transmission for your machine and expect to have the gears and shafts finished by the latter part of the week. We are putting in an alloyed steel shaft with six splines instead of four, as around the Cotta, and

are making the bearing on the splines twice the length as well as making the splines harder. I am sending you herewith B/P D 472 which shows the transmission which we are going to send you and you will note from same that there are only four gears operating at one time in place of having all the gears operate, as heretofore. This will reduce the friction heat in the case and there should be no more running hot in the transmission case. We have given this matter a great deal of study and it has cost us all considerable time and money, and we are sure that this will eliminate all your difficulties. I sincerely want to thank you for your patience and I am sure you will eventually be rewarded when the new transmission is put in the tractor. . . . "

In regard to the replacements, plaintiff's witnesses testified as follows:

"Q. Now, with those new gears in there, will you state what happened?

"A. The same trouble again developed; the same trouble again. It wouldn't operate and we couldn't change the clutches, couldn't change the gear shift.

"Q. There is some mention in the correspondence about heating. Did you have any trouble in that connection?

"A. As the transmission wore, it was inclined to heat more; it was heating as it was wearing."

And in regard to another defect, respondent on April 5th wrote as follows: "Referring to the links for the universal; we are sending you a new set which are more accurately punched than the ones now in use, and I would suggest that your mechanic puts them in at his earliest convenience."

And later in November, after continual breakdowns of the tractor, respondent wrote as follows: "Since taking the Stutes-Mar tractor apart I have come to the conclusion that it will be a waste of money, material and time to replace those parts unless there is some means of preventing the sand from entering the drums. The bearing on the right hand side in bull gear had not moved for several days prior to the breakdown, and still the shaft revolved. This bearing was packed so full of sand and oil that it required a chisel to remove it. The bevel double gears also, in the transmission, replaced by Mr. Shoemaker and Mr. Martin,

are worn one-eighth of an inch. It seems to me the felts inside the drum are useless, therefore, if you assemble any more tractors after this fashion you know what you will be up against. As soon as these parts arrive, please notify me and I will come to Sunnyvale.''

After this letter in the fall of 1921, the following occurred on the ranch: ''Mr. Rexworthy and Mr. Lyle came there late in the fall, stating that Mr. Martin wasn't any longer in their employ, and looked over the machine and came to the conclusion that they would have to put an entire transmission in.''

And the same witness further testified:

''The new transmission was not installed until February, 1922, and it was after that time that the tractor operated eleven and one-half days. . . . After a full new transmission was put in we were able to operate the machine eleven days. After that we had gear trouble again and engine trouble developed.

''Q. Well, now, would it operate at the end of that eleven days under its own power at all?

''A. After we had put a new star or transmission connection in; that was the greatest trouble then; we couldn't hold the universal together.

''Q. Well, now, it broke down in the field at that time?

''A. Yes.

''Q. And what did you do with it then?

''A. We towed it in.

''Q. And you made a further effort to fix it after towing it in?

''A. No.

''Q. It was finally given up then, was it?

''A. As far as I remember. That was the third connection we had in the universal and each one lasted about a day and a half. We ceased to operate the tractor in April of 1922 if I am correct.

''Q. Now what was its condition when you ceased to operate it, Mr. Mackay?

''A. We couldn't change the gears, shift the gears, couldn't change from one gear to another.

''Q. How did they act?

''A. They didn't move; they were stuck, froze or something, didn't move at all, one of them didn't move.

"Q. Couldn't move at all?

"A. No. On that date, April, 1922, when we ceased to operate the tractor we towed the tractor in from the vineyard and put it in storage, in one of the buildings. It was not capable of operating at all on its own power.

"Q. Why not?

"A. Couldn't change the gears, it was always in gear, wouldn't release. I do not recall who was driving the tractor at the time we discontinued its use. We had trouble with the pistons involved in the tractor, in 1922. The rings were broken and one of the push rods was broken."

The testimony further shows that as a result of the foregoing and other deficiencies, the tractor was laid up as unfit for work for a period of 143 days during a working period of 188 days. The evidence does not show that the foregoing defects were cured by replacements. In fact, the evidence is reasonably to the effect that the replacements did not cure the defects. Furthermore, from the testimony of competent experts it could be reasonably inferred, in the absence of any testimony to the contrary, that the foregoing defects were "latent defects arising from the process of manufacture," and were inherent and existing at the time of sale. The expert witness, H. C. Montgomery, after having had his attention called to the foregoing, and other defects, stated that: "The trouble outlined . . . would indicate to me that the tractor was not properly aligned; that the transmission power from the motor to the tracks was not in such alignment that the parts, gears particularly, meshed exactly as they should, and thereby caused trouble both with the gears and with the shafts.

"Q. Now, would you call that defect in material or workmanship?

"A. The fact that some of the parts were taken out and new parts given a different sort of heat treatment would indicate that the original parts were too soft, and that would be a question of material; as to the alignment, that would be a question, in my mind, of workmanship."

Also the same witness gave testimony, from which, in the absence of contradiction, it could reasonably be inferred as the result of the foregoing that the value of the tractor at the time of the sale with these defects inherently existing was around $400 or $500.

Also the expert witness Charles W. Gebhardt testified as regards the source of the trouble outlined as follows: "Well, the general trouble seems to come about from defective workmanship, and possibly defective material; they overlap; because the materials evidently did not hold up for the purpose they were intended . . . as far as the bearings giving trouble is concerned, it seems to me they did not have the proper protection if sand and grit got into them . . . as far as the gears or the shaft being worn—and the gears not sliding—that can be due to the improper treatment of the materials; . . . and with respect to inaccurately punched links for the universal . . . and misalignment of the parts of the universal itself throw the shafts out of their respective angular line, so that you have a vibration set up, and this vibration is a destructive feature in any machine."

As regards the contention of respondent that appellant waived his right to rely upon the foregoing implied warranty, it appears that the facts pertaining to such warranty are fully alleged in the complaint, and it further fails to appear that during the taking of evidence, which would sustain the issue so raised, that the defendant moved either to strike out such evidence or limit it to other issues. And, furthermore, since he placed his whole reliance upon a motion for a nonsuit, he was not precluded from himself introducing evidence to meet the evidence adduced by plaintiff which, as already indicated, tended to support, and did support, the foregoing issue.

The judgment is reversed.

Nourse, J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on October 26, 1928, and a petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 6, 1928.

All the Justices concurred.